PROSSER & SON *v.* UNITED STATES (No. 488).[1]

1. PARTLY OR FULLY MACHINED ARTICLES.
   Steel articles that have been either fully machined or that are rough in part and fully machined in part, are something more than forgings and the term "forgings" can not be taken properly to apply here; they are articles of steel partly or wholly manufactured and were dutiable as such under paragraph 193, tariff act of 1897.

2. PISTON RODS OF STEEL.
   Steel piston rods which have been rough machined and not further advanced than close forged, remain forgings of steel and were dutiable as forgings of steel under paragraph 127, tariff act of 1897.

United States Court of Customs Appeals, April 24, 1911.

APPEAL from United States Circuit Court for Southern District of New York (177 Fed. Rep., 569; T. D. 30340).

*Brown & Gerry* for appellants.
*D. Frank Lloyd*, Assistant Attorney General, for the United States.

Before MONTGOMERY, SMITH, and BARBER, Judges.

SMITH, Judge, delivered the opinion of the court.

Thomas Prosser and Richard Prosser, trading as Thomas Prosser & Son, imported at the port of New York certain articles of steel which were invoiced and entered as follows:

One steel crank shaft, weighing 32,526 kilograms; 2 steel connecting rods, weighing 11,944 kilograms; 2 steel connecting rods, weighing

---

[1] Reported in T. D. 31551 (20 Treas. Dec., 896).

1,036 kilograms; 2 steel crank pins, weighing 176 kilograms; 2 steel crossheads, weighing 2,364 kilograms; 3 steel piston rods, weighing 654 kilograms; 2 steel piston rods, weighing 4,358 kilograms; 2 steel piston rods, weighing 1,808 kilograms; 2 steel piston rods, weighing 2,601 kilograms; 2 steel crank axles, weighing 381 kilograms.

The collector classified these articles as manufactures of metal not specially provided for and assessed them for duty under the provisions of paragraph 193 of the tariff act of July 24, 1897, which reads as follows:

193. Articles or wares not specially provided for in this act, composed wholly or in part of iron, steel, lead, copper, nickel, pewter, zinc, gold, silver, platinum, aluminum, or other metal, and whether partly or wholly manufactured, forty-five per centum ad valorem.

To the classification made by the collector and the duties assessed the importers objected and by protest duly presented set up the claim that the importation was properly dutiable as forgings either under paragraph 127 or paragraph 135 of the tariff act, which paragraphs are as follows:

127. Iron or steel anchors or parts thereof, one and one-half cents per pound; forgings of iron or steel, or of combined iron and steel, of whatever shape or whatever degree or stage of manufacture, not specially provided for in this act, thirty-five per centum ad valorem; anti-friction ball forgings of iron or steel, or of combined iron and steel, forty-five per centum ad valorem.

135. Steel ingots, cogged ingots, blooms, and slabs, by whatever process made; die blocks or blanks; billets and bars and tapered or beveled bars; mill shafting; pressed, sheared, or stamped shapes; saw plates, wholly or partially manufactured; hammer molds or swaged steel; gun-barrel molds not in bars; alloys used as substitutes for steel in the manufacture of tools; all descriptions and shapes of dry sand, loam, or iron-molded steel castings; sheets and plates and steel in all forms and shapes not specially provided for in this act, all of the above valued at one cent per pound or less, three-tenths of one cent per pound; valued above one cent and not above one and four-tenths cents per pound, four-tenths of one cent per pound; valued above one and four-tenths cents and not above one and eight-tenths cents per pound, six-tenths of one cent per pound; valued above one and eight-tenths cents and not above two and two-tenths cents per pound, seven-tenths of one cent per pound; valued above two and two-tenths cents and not above three cents per pound, nine-tenths of one cent per pound; valued above three cents per pound and not above four cents per pound, one and two-tenths cents per pound; valued above four cents and not above seven cents per pound, one and three-tenths cents per pound; valued above seven cents and not above ten cents per pound, two cents per pound; valued above ten cents and not above thirteen cents per pound, two and four-tenths cents per pound; valued above thirteen cents and not above sixteen cents per pound, two and eight-tenths cents per pound; valued above sixteen cents per pound, four and seven-tenths cents per pound.

The protest was heard by board 2 of the Board of General Appraisers, which decided to sustain the claim of the importers. After the decision was signed, but before it was announced, the conclusion reached was challenged by a general appraiser not a member of the

board which passed upon the protest. This resulted in the submission of the whole matter to the full board of nine general appraisers, a majority of which held to the opinion that the protest should be overruled and transferred the case to board 1 for that purpose. Board 1, notwithstanding the fact that its jurisdiction was challenged by the importers, reheard the matter, and after taking additional testimony upheld the classification and assessment of the collector. From this ruling an appeal was taken to the United States Circuit Court for the Southern District of New York, which sustained the jurisdiction of board 1 and affirmed its decision, overruling the protests. The case was then taken on appropriate appellate proceedings to the Circuit Court of Appeals, Second Circuit, which decided that board 1 had no jurisdiction of the subject matter. Accordingly the record was remanded to board 2, which on the evidence. taken by it and on that subsequently introduced before board 1 and in the circuit court sustained the protests and directed a reliquidation of the entries at 35 per cent ad valorem under the provisions of paragraph 127. From this decision both parties appealed, the Government on the ground that the wares were manufactures of steel and therefore dutiable as assessed, and the importers on the ground that as forgings the importation was more appropriately dutiable under paragraph 135 than under the paragraph selected by the board. The Circuit Court for the Southern District of New York, Judge Martin presiding, reversed the board and sustained the collector, and from this decision the importers now appeal to this court.

The issue raised by the appeal is one of definition. The Government contends that the articles are not forgings, first, because they are not known as such to the trade, and, second, because they have passed beyond the forging process and have become articles of steel, partly or wholly manufactured, within the meaning of paragraph 193. On their part the importers urge, first, that "forgings" has no definite, uniform, or general commercial meaning; second, that the articles are "forgings of steel" within the ordinary, common signification of the term; and, third, that in any event, the words of extension "of whatever shape or whatever degree or stage of manufacture" having been made applicable by Congress to "forgings of steel" subsequent to the decision in Saltonstall v. Wiebusch (156 U. S., 601), the wares are "forgings" as defined in that case.

As appears from the evidence, forgings of steel are made from ingots of that metal. These ingots, which are usually twice the size of the finished article, are heated to the proper temperature in the forge shop and there beaten, hammered, or pressed to the general form and approximately to the size required. The article is then said to be "rough forged," and at least to some of the trade is known as a

"rough forging." In earlier years very close work was done with the hammer, and a forging was brought by that process alone to within an eighth of an inch of actual dimensions. That point reached, however, further work with the hammer was suspended and the product was reduced to true size, smoothed off, polished, and finished by other processes. Forging close, however, was not only costly, but was open to the objection that it was attended with the danger of spoiling the forging by a blow too many. With the development of improved methods and high-class machinery it was found that more economical, better, and speedier results could be achieved by not trying to forge close or to remove in the forge shop surplus metal from places not readily accessible. Accordingly in these modern times a forging is rarely hammered to less than a quarter of an inch of the size desired, and the removal by forging methods of excess material difficult to reach is not attempted. To reduce the forging to approximate dimensions and to get rid of surplus metal inconveniently located, the forging is now rough machined or rough turned, and by lathe, slotting machine, or turning mill is attained that which was once accomplished by hammer and anvil. Rough turning or rough machining is more a substituted than an additional process and has for its aim rather the finishing of the forging than the completion of the article to be evolved from the forging. The rough-machined or rough-turned article must still be finish machined or turned and for all practical purposes has not been advanced beyond the stage of a close forging. It may be said, therefore, that rough machining or rough turning does the work of close forging and accomplishes its objects by less costly and tedious means. After rough machining the forging is known to some of the trade either as a "rough turned," "rough machined," or "partially machined" forging, and to others as the rough turned, rough machined, or partially machined article which it is proposed to manufacture. But by whatever name it is known, the sense conveyed by it is that of crudity and roughness. Indeed, no other designation would be appropriate considering that the product still bears upon it the scars and marks of the turning or machining tool employed upon it. After rough turning or rough or partial machining, the forging is finish machined; that is, it is brought to true dimensions and then smoothed off or polished. It is then prepared to be fitted in place. Once finish machined, the product is called by some of the trade a finished machined forging and by others a finished machined shaft, crank pin, piston rod, crosshead, or connecting rod, as the case may be.

From all of this it is evident that "forgings" is not a trade designation and that to it attaches no such definite, uniform, and general commerical meaning as would make that meaning a controlling factor in fixing the classification of the importation under consideration.

The common, ordinary meaning of the word must therefore determine whether the wares in controversy fall within the category of forgings. "To forge" originally meant the hammering or beating of heated metal to shape or form and the production thereby of an article high in tensile strength and capable of resisting strain. In time the hydraulic press, the rolling mill, and other methods came into use to secure the same or similar purposes. A forging, as now commonly understood, may therefore be defined to be a creation of forging processes; an article of metal shaped or formed by hammering or by allied methods producing substantially the same results as hammering.

It is not disputed that all the articles are either fully machined or partly rough machined and partly finish machined, with the exception of the piston-rod forgings, which are rough machined only. As already indicated, we consider rough machining or rough turning as a mere incident to the forging process and as much a refinement in forging as the use of the hydraulic press or rolling mill or the use of a boring machine instead of a mandrel in making hollow forgings. In this view we are strengthened by the circumstance that Congress could hardly have intended to limit importations of forgings to "rough forgings," a commodity which is rarely if ever imported, for the reason that by ordering rough machined or rough turned forgings the importer secures, for all practical purposes, a close forging, pays for less metal, and is to some extent insured against flaws or defects. We are therefore constrained to hold that the piston rods, not being further advanced than if they had been close forged, are forgings of steel and dutiable as such. The case of Saltonstall v. Wiebusch (156 U. S., 601) is not in conflict with this conclusion. That case did not hold that the mere perfection of a forging or the accomplishment by new methods of a result formerly exclusively secured by a careful use of the hammer advanced the stage of manufacture. True, the court did say, "We do not understand the term 'forgings' to be applicable to articles which receive treatment of a different kind than hammering before they are complete," but that language must be considered as referring to the grinding, tempering, and polishing to which the articles there under consideration had been subjected and by which grinding, tempering, and polishing results were obtained not obtainable by the forge master. Moreover, in the very same case the court expressly stated that "It would seem that Congress intended * * * to apply the term 'forgings,' though perhaps not exclusively, to such articles as are completed by the action of the hammer." Indeed, if forgings were limited to those produced by the hammer, in what category would be placed the products of the hydraulic press and the rolling mill?

We think the wares which have been either fully machined or partly rough machined and partly fully machined have advanced

beyond the stage of forgings and are in a condition which was not produced and could not be accomplished by hammer, press, or allied methods. Consequently they are something more than forgings. Castings advanced beyond the casting process cease to be castings. Bromley *v.* United States (156 Fed. Rep., 958); Prosser *v.* United States (1 Ct. Cust. Appls., *supra*, p. 22; T. D. 30848; 1 Ct. Cust. Appls., *supra*, p. 29; T. D. 30850). Forgings advanced beyond the forging process by a parity of reasoning cease to be forgings.

The fact that the statute provides for forgings of whatever shape and whatever degree or stage of manufacture does not warrant the conclusion that Congress intended to give a broader meaning to the word "forgings" than that commonly understood, and much less that any article which had been once submitted to a forging process thereby became a forging for all time, whatever might be the manufacturing processes to which it might be subsequently submitted. Such an interpretation would make a goodly portion of the metal schedule so much useless surplusage, a result which it is evident the legislature did not intend to bring about. The terms of extensions in paragraph 127, if they mean anything, mean the inclusion of treatment purely incidental to the forging and not designed to advance the product beyond the forging stage. Of course, commerce and trade might have given to "forgings" the broad meaning contended for by the importers, but as they admit that trade usage has not been so definite, uniform, and general as to give the word a commercial meaning different from its ordinary signification, that contention must fail.

Paragraph 122 of the tariff act of 1894 made provision for steamer, crank, and other shafts, wrist and crank pins, connecting rods, and piston rods. Paragraph 135 of the tariff act of 1897, which is the successor of paragraph 122, omitted that provision, and it can hardly be claimed that the articles mentioned are assessable for duty as provided in the prior enactment. Had there been any purpose to retain partially manufactured piston rods, connecting rods, and so forth, under paragraph 135, it seems reasonable to infer that the provision for them would not have been stricken out, but modified to that extent. Crossheads and crank axles are not steel in any shape or form within the meaning of paragraph 135.

In our opinion the piston rods are dutiable as forgings under paragraph 127, and the rest of the importation under paragraph 193 as articles of steel partly or wholly manufactured.

As to the piston rods the judgment of the circuit court is therefore *reversed* and in all other particulars it is *affirmed*.

MONTGOMERY, Presiding Judge, and BARBER, Judge, concur. DE VRIES, Judge, having participated in the decision of the Board of General Appraisers, did not sit.